# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00830-COA

| | |
|---|---|
| GLORIA FIELDS AS ADMINISTRATRIX OF THE ESTATE OF DAVITRA KELLY, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES OF DAVITRA KELLY | APPELLANT |

v.

| | |
|---|---|
| GULF PUBLISHING COMPANY, INC. D/B/A THE SUN HERALD AND MARJORIE RICHARDS | APPELLEES |

| | |
|---|---|
| DATE OF JUDGMENT: | 05/15/2018 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | TAUREAN DERNELL BUCHANAN DAMON RAMON STEVENSON |
| ATTORNEYS FOR APPELLEES: | HENRY LAIRD MARY MARGARET KUHLMANN |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 11/26/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., TINDELL AND LAWRENCE, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1.     On August 16, 2016, Davitra Kelly was struck and killed by a vehicle driven by Majorie Richards while Richards was delivering newspapers for her employer, Gulf Publishing Company Inc.  Kelly's mother, Gloria Fields, filed a wrongful-death action against Richards and Gulf Publishing in the Harrison County Circuit Court, First Judicial District.  Prior to trial, Richards and Gulf Publishing designated two expert witnesses—Dr.

Mark Webb as a psychiatrist and Brett Alexander as an accident reconstructionist. Fields filed motions to exclude both experts, arguing that their opinions failed to meet the standards set forth in *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993). The circuit court granted in part and denied in part Fields's motion to exclude Dr. Webb's testimony and denied her motion to exclude Alexander's testimony. After a three-day trial, the jury rendered a unanimous verdict in favor of Richards and Gulf Publishing. Fields now appeals, arguing that the circuit court erroneously admitted the expert testimony of Dr. Webb and Alexander. Finding no error, we affirm the circuit court's decision and final judgment.

## FACTS AND PROCEDURAL HISTORY

¶2. Kelly was an eighteen-year-old woman who lived in Hot Springs, Arkansas at the time of her death. On or about August 14, 2016, Kelly left Hot Springs and traveled to visit her sister, Zadie Lucas, in Gulfport, Mississippi. At 1:41 p.m. on August 15, 2016, the Gulfport Police Department responded to a 911 call from Kelly, complaining of an assault. The police met Kelly at Lucas's apartment at the Gulf Mist Apartment complex, where Kelly told the police that she had been assaulted by her mother, Fields. Fields, however, was not in Gulfport at the time. Kelly told the police that she just needed a ride to Jackson. The police told Kelly that they could not give her a ride to Jackson, and they left the apartment.

¶3. At 1:51 p.m., the police received another call from Kelly, again complaining of an assault. The police went back to the apartment to investigate the complaint. Upon arrival, Kelly told the police again that she only wanted a ride to Jackson. The police again told Kelly that they could not accommodate her request and left the scene. At trial, Officer

2

Landon Williams of the Gulfport Police Department testified that during both meetings with Kelly at the apartment complex, Kelly "was kind of hysterical" and "became angry and just stormed off" when the police told her they could not give her a ride to Jackson. Officer Derrick Tolbert also testified that Kelly "seemed hysterical, but not physically assaulted" when he observed her at the apartments that day. Officer Tolbert further testified that Kelly was crying and very emotional.

¶4. At 8:30 p.m. that same day, an employee of What-A-Burger, located on Highway 49, called the police department regarding Kelly. The employee stated that Kelly had wandered into the restaurant, claiming that she had been assaulted. Kelly also tried to use the restaurant's phone and refused to give the phone back to the employees until the police arrived. When police arrived at What-A-Burger, Kelly told them that she had not been assaulted and that she just wanted a ride to Jackson. The police eventually convinced Kelly to return the restaurant phone and again informed her that they could not give her a ride to Jackson. Kelly then left the restaurant and was last seen by the restaurant employees and police walking along the eastern edge of Highway 49. No other evidence exists in the record regarding Kelly's whereabouts from that time until her death.

¶5. Richards was the district manager for Gulf Publishing, a company in Gulfport that operates the Sun Herald newspaper. At trial, Richards testified that someone from Gulf Publishing called her at 4 a.m. on August 16, 2016 and asked her to deliver extra newspapers to a newspaper carrier that morning. Richards testified that she went to the company's newspaper plant around 5 a.m. to pick up the newspapers. Richards then testified that she

3

was traveling north down Three Rivers Road to deliver newspapers to a store just before the accident occurred.

¶6.    Gulfport Police Officer Joshua Spengler testified that Three Rivers Road is a populated road and that it is common for pedestrians to walk around in that area. However, both Richards and Officer Spengler testified that during the night and early morning hours, the road is very dark and dangerous. Officer Spengler stated that the road has no sidewalks or streetlights but has deep ditches on both sides. Officer Spengler also testified to the following:

> Q:    Once you arrived on the scene, did you notice anything at the scene that would have prevented Marjorie Richards from seeing Davitra Kelly?
>
> A:    Would have prevented [Richards] from seeing [Kelly]?
>
> Q:    Yes.
>
> A:    No. I mean, it's like I said, it's a dark intersection, a dark road, a narrow road. [Kelly] was in dark clothing, a dark green sweater, black or dark pants, black boots, I mean it would be hard to see on, you know, anybody would have a hard time seeing her on the roadway in that area.

¶7.    Richards testified, however, that the headlights on the vehicle worked and that she was using them at the time of the accident. The accident occurred sometime between 5:00 a.m. and 5:45 a.m. Richards stated that she was driving 30 mph in a 35 mph speed zone when she heard and felt a jolt, but she was unsure what struck her vehicle. She testified that she did not see any people or cars around before the impact occurred. Richards then turned her car around and went back to see what had struck her vehicle. Richards saw nothing around the area where the impact occurred and pulled over to a nearby street.

4

¶8.    After Kelly was hit, her body flew approximately six to ten feet from the road and onto the driveway of Eric Vasquez. Vasquez saw Kelly's body and called 911 to report the incident. When police arrived, they saw no skid marks or any other physical evidence on the road. Officer Andrew Taylor of the Gulfport Police Department testified that there was also no evidence that Richards's car ever left the roadway. Kelly ultimately died as a result of the injuries she sustained in the accident.

¶9.    Fields, as the executor of Kelly's estate, then filed this wrongful-death action in circuit court. Prior to trial, Fields filed motions to exclude two of Richards's designated experts—Alexander and Dr. Webb. In its omnibus order, the circuit court granted in part and denied in part Fields's motion to exclude Dr. Webb's expert testimony and completely denied Fields's motion to exclude Alexander's testimony.

¶10.   At trial, Dr. Webb testified as an expert psychiatrist. Dr. Webb testified that he received his medical degree from Tulane University and had been a licensed psychiatrist for twenty-seven years. Dr. Webb further testified that, in addition to his psychiatric practice, he has been qualified to testify as an expert witness, on average, at least twice a month for the last twenty years. He has testified in criminal and civil cases, including workers' compensation, bankruptcy, and chancery matters.

¶11.   To formulate his opinions, Dr. Webb reviewed Kelly's medical records, school records, pharmacy records, police reports, and the depositions of Fields and Kelly's sister, Lucas. Based upon this information, Dr. Webb gave the following expert opinions:

  1.    Kelly's past medical history is significant for blindness, brain mass, and neurocognitive brain disorder and emotional disturbance. Her medical

history at the time of her death was significant for intellectual disability, non-compliance with medications, oppositional-defiant disorder (ODD), attention-deficit disorder (ADD), bipolar disorder, depression, seizure disorder, and partial blindness;

2. Kelly's medical diagnoses were serious and severe and required each one of the medications to be taken as prescribed;

3. One week prior to Kelly's death, she was prescribed the following medications: (I) clonazepam (Klonopin) 2mg tablet—take 1 tablet by mouth 1 time a day at bedtime for seizure disorder and panic disorder; (II) trazodone (Desyrel) 50 mg table—take 1 tablet by mouth a day at bedtime for major depressive disorder; (III) levetiracetam (Keppra) 1000 mg tablet—take 1 tablet by mouth 2 times a day for seizure disorder; (IV) aripiprazole (Abilify) 30 mg tablet—take ½ tablet by mouth 2 times a day for psychotic disorder; (V) lithium carbonate 300 mg tablet—take 1 tablet by mouth 2 times a day for bipolar disorder; (VI) sertraline (Zoloft) 25 mg and 100 mg tablet—take 1 of each tablet by mouth every morning for depression; (VII) hydroxyzine (Atarax) 50 mg tablet—take 2 tablets by mouth 1 time a day at bedtime for anxiety;

4. Even with the appropriate medications taken as directed, the prescribed medications would merely have offered some control over her symptoms;

5. To a reasonable degree of medical probability, Kelly's behavior as documented by the Gulfport Police Department and Fire Department on the afternoon and evening of August 15, 2016, and in the early morning hours of August 16, were the result of non-compliance with her medications;

6. The likely effects of her failure to take all of her prescribed medications as directed are motor imbalance, seizures, irrational and psychotic behavior, including, but not limited to, hallucinations and paranoia;

7. Medical diagnoses made by other physicians are accurate, and [Dr. Webb] would assign Kelly a DSM V diagnoses of Bipolar Disorder, PTSD, and Intellectual Disability at the time of her death. Further, Kelly suffered from multiple psychiatric, physical, emotional, and intellectual diagnoses and disorders; and

8. American Medical Response (AMR) medical records of August 16,

6

2016, establish that upon their arrival and initial assessment and treatment of Kelly, she had no response to pain, and within minutes of their arrival, she sustained cardiac arrest and was in asystole.

¶12.   Alexander was admitted as an expert in accident reconstruction. Alexander testified that he had been an accident reconstructionist for over thirty years and owned an accident-reconstruction and consulting firm in Hattiesburg, Mississippi. He testified that he had previously worked with the Hattiesburg Police Department and became certified in accident reconstruction during his time in law enforcement. Alexander also testified that he taught accident-reconstruction courses, and one of his former students was Officer Taylor, another witness at trial. Finally, Alexander testified that he had been admitted as an expert witness in both federal and state cases, including in both Mississippi and Louisiana.

¶13.   Prior to trial, Alexander reviewed depositions of the police officers who were at the scene of the accident, read police reports of the accident, looked at photographs of the accident scene and Richards's vehicle, and visited the accident scene two or three times. Based upon his review of the information, Alexander offered the following expert opinions at trial:

1.   The accident occurred at "nautical twilight," or within 37 minutes prior to sunrise. There was no light from the sun yet but also no illumination from the moon, as it had already set at that point.

2.   At the time of the accident, Kelly was wearing a dark blue shirt, black pants, and black boots. Kelly's surroundings were also dark at the time, and she was dark, meaning that no contrast existed between Kelly and her surroundings. The more a person lacks contrast with his or her surroundings, the more time it would take for a driver to identify and detect if an object was in the driver's path. Because of these factors, Kelly was somewhat camouflaged and would have been extremely difficult to see at this time of night.

7

3. No evidence existed from the accident scene, such as tire tracks or skid marks, suggesting that Richards's vehicle ever left Three Rivers Road prior to or during the accident. This lack of evidence indicated a higher probability than not that Kelly was in the roadway when she was struck by Richards's vehicle.

¶14. Upon hearing all the evidence at trial, including the expert testimony, the jury unanimously rendered a verdict in favor of Richards and Gulf Publishing. Aggrieved, Fields appeals.

## STANDARD OF REVIEW

¶15. We apply an abuse-of-discretion standard when reviewing a circuit court's decision to admit or exclude evidence from the jury, including expert testimony. *Dedeaux Util. Co. v. City of Gulfport*, 63 So. 3d 514, 520 (¶8) (Miss. 2011). Unless we conclude that the circuit court's decision to admit or exclude evidence was arbitrary and clearly erroneous, the decision shall stand. *Id*.

## ANALYSIS

¶16. On appeal, Fields challenges the circuit court's decision to admit the expert testimony of both Dr. Webb and Alexander. Fields argues that Dr. Webb and Alexander offered opinions that failed to meet the standards for expert testimony promulgated by Mississippi Rules of Evidence 702 and *Daubert*. Fields further argues that the experts' opinions were unduly prejudicial against Kelly.

¶17. Rule 702 charges circuit courts "with being gatekeepers on questions of admissibility of expert testimony." *Canadian Nat'l/Ill. Cent. R.R. Co. v. Hall*, 953 So. 2d 1084, 1094 (¶31) (Miss. 2007). Rule 702 states the following:

8

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) their testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Courts determine the admissibility of expert-witness testimony by following the standards set forth by the United States Supreme Court in *Daubert*, 509 U.S. at 579, and modified in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). This test was formally adopted into Mississippi jurisprudence in the case of *Mississippi Transportation Commission v. McLemore*, 863 So. 2d 31 (Miss. 2003). In applying the *McLemore* test, expert testimony can only be admitted if it passes a two-pronged analysis. *Id*. at 35 (¶7). First, the expert testimony must be relevant, assisting the trier of fact with matters beyond that of a lay juror. *Id.* at 35-36 (¶¶7-8). Second, to determine reliability the Court considers the following illustrative yet non-exhaustive list that the *Daubert* Court adopted: (1) whether the theory or technique can be and has been tested: (2) whether the theory has been the subject of peer review and publication; (3) the known or potential rate of the error of the technique or theory when applied; (4) the existence of standards to control the technique's operation; and (5) the general acceptance the theory has garnered in the relevant expert community. *McLemore*, 863 So. 2d at 36-37 (¶13). Ultimately, an expert's opinion is reliable if it is grounded in "the methods and procedures of science, not merely his subjective beliefs or unsupported speculation." *Id*. at 36 (¶11).

¶18. Once the circuit court fulfills its gate-keeping function and determines that the

9

expert's opinion is both relevant and reliable to the facts of the case at hand, the opinion is presumptively admissible. *Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 675 (¶19) (Miss. 2010). However, "if an expert's testimony survives the threshold scrutiny under Rule 702, it is subject to further review under [Mississippi Rule of Evidence] 403." *Denham v. Holmes ex rel. Holmes*, 60 So. 3d 773, 784 (¶38) (Miss. 2011). Rule 403 permits the exclusion of evidence if the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." M.R.E. 403. Once the expert testimony survives scrutiny under Rule 702 and Rule 403, "then it is within the province of the trier of fact to give weight and credibility to the testimony." *Burnwatt v. Ear, Nose & Throat Consultants of N. Miss.*, 47 So. 3d 109, 119 (¶37) (Miss. 2010).

¶19. On April 24, 2018, the circuit court entered its omnibus order, which provided rulings for a majority of the parties' pre-trial motions, including Fields's motions to exclude both Dr. Webb and Alexander. Upon reading Dr. Webb's summary of opinions and supplemental summary of opinions, the circuit court evaluated each opinion using *Daubert* and Mississippi Rules of Evidence 401, 402, 403 and 702. In doing so, the circuit court found that some, but not all, of Dr. Webb's opinions complied with these rules. In the omnibus order, the circuit court narrowly-tailored Dr. Webb's testimony to the foregoing opinions, which the circuit court ruled passed the requisite standards.

¶20. The circuit court applied the same well-reasoned analysis to Alexander's opinions and found that all of his opinions complied with Mississippi law and *Daubert*. Alexander was

therefore allowed to testify as to all of his proposed conclusions at trial.

## I. Dr. Webb's Expert Testimony

¶21. We first address Fields's issues regarding Dr. Webb's testimony. Specifically, Fields asserts the following:

1. Dr. Webb's testimony about Kelly's motor skills was unreliable;

2. Dr. Webb provided no scientific support for his assertion that Kelly suffered lack of coordination and motor instability at the time of the accident; and

3. Dr. Webb's testimony regarding Kelly's prior vision problems was irrelevant.

¶22. Prior to trial, Dr. Webb reviewed Kelly's emergency-room records and other medical records from St. Vincent Hospital in Hot Springs, Arkansas; Oschner Hospital in New Orleans, Louisiana; Coastal Family Health in Gulfport, Mississippi; and Garden Park Hospital in Gulfport, Mississippi. These medical records spanned from 2011 to August, 8, 2016, one week prior to the accident. Based upon these records, Dr. Webb testified that Kelly was diagnosed with several significant psychiatric illnesses for which she was prescribed no less than seven medications. These illnesses included ADD, bipolar disorder, depression, seizure disorder, anxiety, partial blindness, and ODD.

¶23. Because Kelly was primarily treated at St. Vincent Hospital, Dr. Webb also reviewed Kelly's pharmacy records to see exactly what she had been prescribed and which prescriptions had actually been filled. Kelly's medical and pharmacy records revealed that she had been prescribed the following: Klonopin for seizure, anxiety, and panic disorders; Desyrel for major-depressive disorder; Keppra for seizure disorder; Abilify for psychotic

11

disorder, mood shifts, and bipolar disorder; lithium carbonate for bipolar disorder; Zoloft for depression; and Atarax for anxiety and depression. Dr. Webb testified that based on the medical and pharmacy records, Kelly had been prescribed these medications for several years and was required to take them all daily.

¶24. Dr. Webb further testified that, in addition to Kelly's medical and pharmacy records, he reviewed Kelly's school records from Hot Springs, spoke with Kelly's sister, and read the depositions of Fields and Kelly's sister. Based upon his review of this evidence, Dr. Webb testified that Kelly was habitually non-compliant in taking her medications. Significantly, Dr. Webb referred to Kelly's emergency-room records from St. Vincent Hospital, dated August 8, 2016, which indicated that her emergency-room visit was related to her non-compliance with medications. This specific set of records also noted that Kelly's most recent difficulties of non-compliance occurred between "10/29/15 to present," meaning that Kelly had difficulties complying with her prescriptions for almost a year before the accident.

¶25. Dr. Webb also testified that he spoke with Kelly's sister, Lucas, regarding Kelly's visit prior to the accident and read Lucas's deposition. Dr. Webb discovered through Lucas that Kelly had only taken two of her seven medications in the days leading up to her death, a fact that Lucas herself confirmed at trial.

¶26. Based upon the information provided in the medical records and by Lucas, Dr. Webb offered the following testimony:

> Q.   Did you determine whether Davitra Kelly was faithful in taking her medications?
>
> A.   In looking at the various different medical records and the ER records,

12

> my recollection is that she was having difficulty with compliance . . . [w]hich can be very problematic with the multiple illnesses that she had.
>
> Q. And in terms of medical psychiatric probability, do you have an opinion about the effect on Davitra Kelly for her failure to take these medications?
>
> A. You get two major problems if you don't take your medications right. I don't care if it's antibiotics or anything. But in Davitra Kelly, the medicines that she was taking, if you stopped your medicines and don't take it regularly, you not only have the potential for the illness to come back, for which you are taking the medicine because you are not on the medicine, [but] also withdrawal from these medications. We're learning more and more about psychiatric medications and the potential for significant and sometimes lethal withdrawal with medications if they're just stopped all at once.

Dr. Webb opined that at the time of the accident Kelly had not been taking all of her prescribed medications, and therefore, she would have likely started to suffer from these psychiatric and withdrawal symptoms in the days and hours prior to the accident. He explained in the following testimony:

> Q. And in terms of medical probability, what was the effect on Davitra Kelly for not taking those medications?
>
> A. Like I said earlier, you get attention difficulty coming back, part of your ADD, and also you get the withdrawal symptoms. And each one has different sets of withdrawal symptoms. Klonopin is the worst one. That's a habit-forming medicine, so it's a dependent-producing medicine. So if you stop it, you could have seizures, dizziness, lack of control, motor instability, it's a lethal – you should not stop your Klonopin medicine, especially at that dose, it can be lethal. And Abilify is not quite as bad to stop it, but remember, like I said earlier, she was taking the maximum dose. So that is going to have you unsteady, going to have you clouded, and going to give you difficulty with [the] illness wanting to start to come back. She had some significant illnesses, mood shifts, things like that.

13

¶27.    He further testified to reading the police reports from Gulf Mist Apartments and What-A-Burger, which occurred just before Kelly's death. In Dr. Webb's opinion, Kelly's "bizarre" behavior prior to her death strongly indicated that she was already exhibiting signs of non-compliance with her medication, such as "psychotic behavior" and "lack of touch with reality." Dr. Webb explained:

A.    [W]e've got somebody who is off medications who is having the illness come back, their mind is playing tricks with them, and also having some withdrawal where they are not acting right. Not in a bad way, just in their psychotic way . . . .

. . . .

A.    Continuance of her psychotic and out-of-touch behavior, acting odd, acting bizarre, [at] What-A-Burger talking about wanting to go to Jackson, things like that. And just very odd bizarre behavior, which is typical of the illness and also going through the withdrawal of medications. You can't take seven medicines regularly and then all of a sudden just stop without having some issues.

¶28.    Regarding Kelly's motor skills, Dr. Webb offered the following testimony:

Q.    Do you have an opinion about, in terms of medical psychiatric probability, about the effect of not taking these prescriptions on Davitra Kelly's motor ability or motor balance?

A.    Yes.

Q.    What is that opinion?

A.    Like we said earlier, those medicines, Klonopin especially. If you stop that, you become very unstable. It causes difficulty with dizziness, lack of coordination, and motor instability.

¶29.    Dr. Webb testified on cross-examination that, in Lucas's deposition, she described how Kelly had tripped over a plastic bag in the hours before her accident. Dr. Webb

14

explained that when looking at "the whole picture of the oddness and the bizarreness" in the hours leading up to the accident, Kelly's behavior exemplified a person who was experiencing symptoms of non-compliance with her specific medications.

¶30. Finally, regarding Kelly's eyesight, Dr. Webb testified as to obtaining the following information from Kelly's medical records:

> Q. Did you have the opportunity to determine the quality of eyesight of Davitra Kelly?
>
> A. In looking at the Ochsner records, they talk about blindness, they talk about new onset partial, unilateral, and/or bilateral blindness. They did a brain biopsy trying to define what the issue was. This was back in 2012. Trying to get an idea of what . . . the brain disease that was going on that was giving her some difficulty with vision.

¶31. In summation, Dr. Webb concluded that, because of Kelly's significant, severe mental illnesses, she was required to take her prescribed daily medications or else face severe psychotic and withdrawal symptoms. Dr. Webb further concluded that based upon Lucas's testimony and Kelly's long history of non-compliance with her medications, documented even up until a week before the accident, Kelly had been non-compliant with taking her necessary medications prior to the accident. Finally, because of her non-compliance, Dr. Webb opined that she would likely be experiencing severe symptoms up until the accident, as evidenced by her interactions with the police at the Gulf Mist Apartments and What-A-Burger.

¶32. Fields argues that these opinions are unreliable because they are factually and scientifically unsupported. The Mississippi Supreme Court has stated that "the facts upon which the expert bases his opinion must permit reasonably accurate conclusions as

15

distinguished from mere guess or conjecture." *Janssen Pharm. Inc. v. Bailey*, 878 So. 2d 31, 60 (¶135) (Miss. 2004) (internal quotation mark omitted). "The facts relied upon must afford a reasonably accurate basis for the expert's conclusion." *Id*. (internal quotation marks omitted).

¶33. Here, Dr. Webb repeatedly testified that he reviewed Kelly's medical records, pharmacy records, school records, police records, and Fields's and Lucas's depositions. The medical and pharmacy records spanned from 2011 to a week before Kelly's death in August 2016. With these records, Dr. Webb determined the various types of illnesses Kelly endured, what medications she had been prescribed, and when she was required to take those medications. Furthermore, these records easily allowed Dr. Webb to discover that Kelly had a history of non-compliance leading up until at least a week before her death. Dr. Webb was then able to opine about the likely effects of Kelly's specific medications and what symptoms, such as lack of motor skills, typically occur in patients who are non-compliant.

¶34. Dr. Webb also had Lucas's testimony and the Gulfport Police Department reports, which further established a factual basis for his opinion that Kelly had been exhibiting symptoms of non-compliance with her medication up until the hours before her death, facts which Lucas and Officers Taylor and Spengler corroborated with their own testimonies. Again, Lucas testified to seeing Kelly take only two of her seven prescribed medications while staying in her apartment. This testimony, along with the evidence of Kelly's behavior at Gulf Mist Apartments and What-A-Burger established through the officers' reports and testimonies, provided a reasonable basis by which Dr. Webb could conclude that Kelly was

16

at least beginning to exhibit signs of non-compliance prior to the subject incident. As such, we certainly find that a sufficient factual basis existed for Dr. Webb's expert conclusions.

¶35. Fields also argues that Dr. Webb provided no scientific support for his conclusions. In addition to a sufficient factual basis, a circuit court's role as gatekeeper includes ensuring that an expert's opinion "has a reliable basis in the knowledge and experience of the relevant discipline." *Fipps v. Greenwood Leflore Hosp.*, 237 So. 3d 194, 196 (¶8) (Miss. Ct. App. 2018). Prior to explaining his conclusions, Dr. Webb testified that he has been a psychiatrist for twenty-seven years, testifying in courtrooms at least twice a month for twenty years. Dr. Webb also testified that, ideally, psychiatrists in his profession would rather examine the individual in person. However, where the individual is unavailable, as in this case, it is common practice to look at medical records, depositions, pharmacy records, high-school records, and "every aspect of the person's life as much as we can." Here, based upon the data Dr. Webb gathered from Kelly's records, as well as his twenty-seven years of experience in psychiatry, he was able to associate Kelly's symptoms or potential symptoms with her non-compliance of medications.

¶36. We also note that, before trial, the circuit court reviewed all Dr. Webb's proposed opinions and found that some, but not all, of the opinions complied with the Mississippi Rules of Evidence and *Daubert*. In its role as gatekeeper, the circuit court narrowly tailored Dr. Webb's testimony to the above-mentioned opinions. As such, Dr. Webb was allowed, based upon his experience and qualifications as a psychiatrist, to offer opinions regarding Kelly's illnesses, medications, and likely symptoms of non-compliance with those

medications. However, the circuit court prohibited Dr. Webb from offering any opinion as to what may have contributed to the cause of her death. When considering the wide latitude we afford to expert opinions, as well as the sound discretion we allow circuit courts in admitting expert testimony, we find no error in the circuit court's decision to admit the remainder of Dr. Webb's expert testimony. *See Poole v. Avara*, 908 So. 2d 716, 721-24 (¶¶8, 16) (Miss. 2005).

¶37. Fields also asserts that Dr. Webb's testimony regarding Kelly's vision problems was unduly prejudicial against Kelly. Fields is correct in that Rule 403 permits the circuit court to exclude otherwise admissible testimony when that testimony is unduly prejudicial or may mislead the jury. M.R.E. 403. However, Dr. Webb never drew the conclusion in his testimony that vision problems contributed to her death. The only mention of Kelly's vision problems came when Dr. Webb gave his expert opinion regarding Kelly's medical history, which included blindness. In fact, Dr. Webb specifically acknowledged during his testimony that Kelly was diagnosed with blindness in 2012 and required a brain biopsy to discover what was causing it. He further testified that he saw no medical records indicating blindness in 2016, before Kelly died, but only from 2012. We therefore find that this argument lacks merit.

## II. Alexander's Expert Testimony

¶38. Fields also argues that the circuit court erred in allowing Alexander's expert testimony on accident reconstruction. Specifically, Fields argues that Alexander's testimony regarding Kelly's location at the time of the accident was unreliable and unduly prejudicial.

18

¶39.    Alexander opined that because no physical evidence indicated that Richards's car ever left the roadway, Kelly was, more likely than not, walking in the middle of the roadway at the time of the accident. Fields argues that "there was too great of an analytical gap between the data and the proffered opinion" simply because Alexander found no skid marks or other physical evidence. Fields cites two cases to support her unreliability argument. In the first case, *Mitchell v. Barnes*, 96 So. 3d 771, 778 (¶25) (Miss. Ct. App. 2012), this Court reversed the admission of expert testimony by a plaintiff's accident reconstructionist because the testimony did not comply with Rule 702 or *Daubert*. In *Mitchell*, we found the expert's opinion to be purely speculative in that the expert

> (1) did not know the distance the motorcycle traveled after hitting Mitchell's car; (2) did not know the exact location where the motorcycle came to rest; (3) was given an estimate of between fifty and one hundred feet by Officer Foster of the distance between impact and the motorcycle's resting place; (4) did not have any physical evidence from the scene of the accident to review; (5) "picked" a coefficient-of-friction number to determine the speed of Barnes's motorcycle at the time of the accident; (6) did not have photographs of the accident scene; (7) did not inspect Barnes's motorcycle; (8) relied on the recollections of Officer Foster and other eyewitnesses more than one year after the accident in formulating his expert opinions; and (9) did not record the interviews with Barnes or the other eyewitnesses.

*Mitchell*, 96 So. 3d. at (¶24).

¶40.    In the second case, *Denham v. Holmes ex rel. Holmes*, 60 So. 3d 773, 787 (¶51) (Miss. 2011), the Mississippi Supreme Court upheld the exclusion of an expert's testimony after an accident reconstructionist concluded, based upon a lack of physical evidence, that the defendant's vehicle had not caused an immediate hazard when turning in front of the plaintiff and thereby causing the cars to impact. The expert based her conclusions solely on a lack of

19

skid marks but offered no clear explanation as to why skid marks were necessary to conclude that the defendant was not negligent. *Id*. at (¶¶52-53). As such, the *Denham* court found that too great of an analytical gap existed between the expert's data and conclusions. *Id*. at 791 (¶67).

¶41. Alexander's testimony, however, is distinguishable from that of the expert accident reconstructionists in *Mitchell* and *Denham*. First, Alexander testified that to form the basis of his opinions, he (1) visited the accident scene multiple times, including just after the accident; (2) photographed the accident scene; (3) inspected and photographed Richards's vehicle; (4) performed forensic mapping of the accident scene; (5) reviewed the depositions of the Gulfport police officers; and (6) reviewed the police reports following the accident. Second, Alexander's opinion was supported by the testimony of Officers Taylor and Spengler, who investigated the accident scene that night. Officers Taylor and Spengler testified that they also found no skid marks, tire tracks, or other physical evidence at the scene immediately following the accident and included this information in their police reports, which Alexander also used to formulate his conclusions.

¶42. Third, unlike in *Denham*, Alexander explained to the jury the basis behind his conclusions. Alexander first explained that the accident occurred during "nautical twilight," which meant that the moon had already set but the sun had not risen. Alexander further testified that he had visited the accident scene at night, and the area surrounding the accident was also shaded by trees. Alexander explained that when a person combines the darkness of nautical twilight with that of the surrounding areas on Three Rivers Road, and considers

20

the dark clothing that Kelly wore the night of the accident, one could reasonably conclude that anyone would have had difficulty seeing Kelly had she been walking on Three Rivers Road at the time of the accident.

¶43.   Alexander then offered the following explanation of the roadway:

Q.   When you were on the accident scene, did you ever measure the distance between the white fog line and the end of the asphalt pavement?

A.   Yes, sir, I did.  We measured it at nine inches.

Q.   And then as you go from . . . right to left, from the white fog line, what is to the left of the fog line in the asphalt?

A.   You've got a little gravel and grass there, and it is sloping.  Because just to . . . what would be the east running down that road is a ditch.  So it gradually sloped from that edge of pavement, it gradually sloped down into a ditch.

¶44.   Next, Alexander explained that during his own investigation of the accident scene, six days after the accident, he did not find skid marks, tire tracks, or other physical evidence in that area indicating that Richards's vehicle ever left the roadway.  He did acknowledge that this evidence could have disappeared by the time he investigated the scene.  Taking this possibility into consideration, however, he consulted the accident reports provided by the Gulfport Police Department.  These reports also noted a lack of physical evidence, which further confirmed his conclusions.

¶45.   Finally, the police reports noted that Kelly's body was found approximately six to ten feet to the right of the road on Vasquez's driveway.  In addition to these reports, Alexander testified that he found Kelly's boot approximately five feet from the road.  Alexander

21

explained, however, that this also gives no indication that Richards ever left the roadway, stating:

> Well, because of the type of collision that we had here . . . the pedestrian was struck right at the . . . passenger side front corner. What happens in this case is, depending on the type of vehicle, the type of person involved, what happens is, they're hit below their center of mass. So they tend to roll onto the hood. In this case, she rolled onto the hood and she hit what we call the A pillar or the front passenger side that connects to your windshield. She hit that. So what's going to happen in that scenario is she is going to be projected forward, same direction the car is going, but she is also going to be directed to the right, because she came off of the A pillar, that pillar. So when she hits it, then she is going to go off forward and to the right.

¶46. He explained that, even driving forward on Three Rivers Road, the damage to Richards's vehicle suggests that she hit Kelly on the right side, thereby projecting her several feet forward and to the right. All factors considered, Alexander ultimately concluded that, more likely than not, Kelly was walking on Three Rivers Road when she was struck.

¶47. In light of Fields's referenced cases, we will note that the Mississippi Supreme Court certainly allows a witness to testify as to physical facts found at an accident scene. *See Edwards v. Ellis*, 478 So. 2d 282, 288 (Miss. 1985) (citing *Lynch v. Suthoff*, 220 So. 2d 593, 596 (Miss. 1969)). Here, Alexander used his thirty years of experience in accident reconstruction to examine the physical facts (or lack thereof) surrounding the accident scene and formulate an opinion as to where Kelly was located at the time of the accident. Also, Alexander's testimony is easily distinguishable from the accident reconstructionists' testimonies in *Mitchell* and *Denham*. Alexander offered the jury a reasonable explanation for his conclusions, thereby bridging the analytical gap Fields claims exists. As such, we find Alexander's conclusions to be sufficiently reliable.

¶48. We also disagree with Fields's argument that Alexander's conclusions were unduly prejudicial and misleading to the jury under Rule 403. Fields offers no support for this argument other than her contention that Alexander's conclusions relating to Kelly's position before the accident were unreliable. Again, we note that the circuit court analyzed Alexander's opinions and found that each opinion complied with Mississippi's procedural rules and *Daubert*. Because we find Alexander's conclusions to be sufficiently reliable, we also find that they comply with Rule 403.

## CONCLUSION

¶49. We find that both Dr. Webb's and Alexander's opinions comply with Rules 702 and 403 and the standards set forth in *Daubert*. As such, we find that the circuit court did not abuse its discretion in admitting these opinions. We therefore affirm the circuit court's judgment in favor of Richards and Gulf Publishing.

¶50. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

23